FILED
MAY 3 1 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| L-3 COMMUNICATIONS CORP. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-431 C |
| | ) | Judge: |
| U.S. DEPARTMENT OF THE INTERIOR | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

Michael A. Hordell
PEPPER HAMILTON LLP
600 14th Street, N.W., Suite 500
Washington, DC 20005-2004
Telephone: (202) 220-1200
Facsimile: (202) 220-1665
L-3 Communications Corporation
Link Simulation & Training Division

Of Counsel
Charles H. Carpenter
Sean P. Bamford
PEPPER HAMILTON LLP

Dated: May 30, 2006

## TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. STATEMENT OF THE ISSUES ........ 2

III. STATEMENT OF THE FACTS ........ 2

IV. ARGUMENT ........ 8

A. General Standard of Review ........ 9

B. Standard for Interim Injunctive Relief ........ 10

1. L-3 is Likely to Prevail on the Merits Because There is Clear and Prejudicial Evaluation Errors ........ 12

a. GovWorks' Evaluation of L-3's Technical Proposal was Improper ........ 12

b. GovWorks' Evaluation of Lockheed Martin's Proposal was Improper ........ 17

c. GovWorks Failed to Treat Offerors Equally ........ 23

d. GovWorks Cost Realism Analysis was Unreasonable and Improper ........ 25

e. GovWorks' Best Value Determination Was Improper ........ 28

2. L-3 Will Suffer Irreparable Harm if Injunctive Relief is Denied Because L-3 Will Have Been Denied the Opportunity to Fairly Compete for Award; L-3 Will be Forced to Terminate a Part of its Workforce and Will be Forced to Demobilize ........ 30

3. The Balance of Hardships on all the Parties Favors L-3 Because the Procurement Was Improperly Conducted ........ 32

4. Injunctive Relief Will Serve The Public's Interest ........ 34

V. CONCLUSION AND RELIEF REQUESTED ........ 35

APPENDIX: Exhibit A – Affidavit of Edward S. Brannum
Exhibit B – Agency Protest Decision, May 22, 2006
Exhibit C – Affidavit of David F. Williams

# TABLE OF AUTHORITIES

## CASES

*Alaska Cent. Express, Inc. v. United States*, 51 Fed. Cl. 227 (2001) .................... 11

*Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999)...... 17

*Antarctic Support Associates v. United States*, 46 Fed. Cl. 145 (2000) .................. 9

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 S.Ct. 2246 (1983) .......................................................................... 9

*Bannum, Inc. v. United States*, 404 F.3rd 1346 (Fed Cir. 2005) ........................... 13

*Bendix Oceanics, Inc.*, B-247225.3, July 27, 1992, 92-2 CPD ¶ 5........................ 29

*Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384(2005)......................... 23

*Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 663 (1997) ........................ 9, 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 81 S.Ct. 814 (1971)...................................................................................... 9, 10

*Compressed Air Equip.*, B-246208, Feb. 24, 1992, 92-1 CPD ¶ 220 .................... 17

*Day & Zimmermann Servs. v. United States*, 38 Fed.Cl. 591 (1997).................... 25

*Eigen*, B-249860, Dec, 21, 1992, 92-2 CPD ¶ 426 ............................................ 28

*Ellsworth Associates, Inc. v. United States*, 45 Fed. Cl. 388 (1999)...................... 30

*Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) ...... 11

*Filtration Development Co., LLC v. United States*, 60 Fed.Cl. 371 (2004).......... 11

*Fru-Con Constr. Co., Inc. v. United States*, 57 Fed.Cl. 483 (2003)...................... 10

*Future-Tec Mgmt. Sys., Inc.; Computer & Hi-Tech Mgmt., Inc.*, B-283793.5, B-283793.6, Mar. 20, 2000, 2000 CPD ¶ 59 ........................................................ 28

*Gentex v. United States*, 58 Fed. Cl. 634 (2003) .................................................. 22

*GraphicData, L.L.C. v. United States*, 37 Fed. Cl. 771 (1997) ............................ 10

*GTS Duratek, Inc.*, B-280511.2, B-280511.3,
Oct. 19, 1998, 98-2 CPD ¶ 130 .................... 16

*Hospital Klean of Texas, Inc. v. United States*, 65 Fed.Cl. 618 (2005) .................... 31

*Isratex, Inc. v. United States*, 25 Cl. Ct. 223, (1992) .................... 11

*JWK International Corp. v. United States*, 49 Fed. Cl. 364 (2001) .................... 12, 25,34

*KSEND v, United* States, 69 Fed. Cl. 103 (2005) .................... 13

*Labat-Anderson v. United States*, 50 Fed.Cl. 99 (2001) .................... 34

*LifeCare, Inc.*, B-291672, B-291672.2, Feb. 20, 2003, 2003 CPD ¶. 95 .................... 18

*Logicon, Inc. v. United States*, 22 Cl. Ct. 776 (1991) .................... 11

*Magellan Corp. v. United States*, 27 Fed. Cl. 446 (1993) .................... 11, 34, 35

*Magnavox Electric Systems Co. v. United States*,
26 Cl. Ct. 1373 (1992) .................... 31, 33, 34

*MCI Telecommunications Corp. v. FCC*, 675 F.2d 408 (D.C. Cir. 1982) .................... 11

*MVM, Inc. v. United States*, 46 Fed. Cl. 137 (Fed. Cl. 2000) .................... 18

*NKF Eng'g, Inc. v. United States*, 9 Cl. Ct. 585 (1986) .................... 9

*OMV Medical, Inc. v. United States*, 219 F.3d 1337 (Fed. Cir. 2000) .................... 25

*Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728 (2000) .................... 34, 35

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) .................... 10

*Scanwell Lab., Inc. v Shaffer*, 424 F.2d 859, 866-67 (D.C. Cir. 1970) .................... 35

*SeaSpace*, B- 241,564, Feb. 15, 1991, 70 Comp. Gen. 268, 91-1 CPD ¶ 179 .................... 28

*Standard Haven Products v. Gencor Industries*,
897 F.2d 511 (Fed. Cir. 1990) .................... 12

*Sterlingwear of Boston, Inc. v. United States*, 10 Cl. Ct. 644 (1986) .................... 33

*The Jonathan Corp., Metro Mach. Corp.*, B-251698 *et al.*,
May 17, 1993, 93-1 CPD ¶ 174 .................... 24

*TRW Environmental Safety Systems v. United States*,
16 Cl. Ct. 520 (1989) .......... 11, 31, 33

*University Research Co., LLC, v. United States*, 65 Fed.Cl. 500 (2005) .......... 30

*U.S. Ass'n of Importers of Textiles & Apparel v. United States*,
413 F.3d 1344 (Fed. Cir. 2005) .......... 10

*U.S. Sprint Communications Co., Ltd. Partnership*, B-243767, Aug. 27, 1991,
91-2 CPD ¶ 201 .......... 28

*Washington Metropolitan Area Transit Authority v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) .......... 11,12

STATUTES AND REGULATIONS

5 U.S.C. § 701 *et seq*... .......... 1

5 U.S.C. § 706(2) .......... 9

28 U.S.C. § 1491 .......... 1, 9

48 C.F.R. (FAR) 15.201 .......... 22

48 C.F.R. (FAR) 15.305 .......... 28

48 C.F.R. (FAR) 15.404-1 .......... 25

48 C.F.R. (FAR) 33.103 .......... 7, 33

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| L-3 COMMUNICATIONS CORP.<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR<br><br>Defendant. | ) | No. ______<br>Judge: ______ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

This is a post-award bid protest by L-3 Communications Corporation, Link Simulation & Training Division ("L-3") against the United States Department of the Interior, GovWorks, ("GovWorks" or Agency). L-3 seeks declaratory and injunctive relief pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. This action seeks the review of GovWorks' evaluation of L-3's and Lockheed Martin Services Inc.'s ("Lockheed Martin") proposals, its price realism analysis, its cost technical trade-off, and award of a contract for Joint Terminal Attack Controller Training and Rehearsal System ("JTAC TRS") Engineering and Design Support, pursuant to Request for Proposals ("RFP") Number 60246, to Lockheed Martin. GovWorks' actions were arbitrary and capricious, without a rational basis, and contrary to applicable statute, regulation, and the terms of the solicitation. Moreover, GovWorks' actions are extremely prejudicial and harmful to L-3. Specifically, had GovWorks

conducted a proper evaluation, L-3 would have been selected as the best value to the Government.

L-3 seeks preliminary and permanent injunctive relief preventing GovWorks from permitting Lockheed Martin to commence contract performance. Ultimately, GovWorks should be directed by this Court to make award to L-3.

## II. STATEMENT OF THE ISSUES

The direct issue before the Court on this motion is whether interim injunctive relief is warranted in this case based on an evaluation of the facts. The question raised in this matter is as follows:

A. Should L-3 have been awarded the contract? GovWorks failed to make a proper best value determination and resulting award decision because GovWorks' evaluation of L-3's and Lockheed Martin's proposals were erroneous and improper, and/or GovWorks' cost realism analysis and cost technical trade-off were unrealistic and improper.

## III. STATEMENT OF THE FACTS

The principal facts are detailed in the Complaint. The following is a narrative for the Court's reference.

### THE PROCUREMENT

On or about December 12, 2005, GovWorks, on behalf of the United States Department of the Air Force ("Air Force"), issued the RFP for the procurement of a second exemplar JTAC VT Dome, as well as a prototype and/or enhanced interim training capability for the JTAC TRS Deployable/Garrison System, 2nd Generation JTAC training and rehearsal simulation environment. The offerors were advised that "[t]he contractor shall supply all labor and

materials necessary to perform work under this Contract." See RFP § B.1. The contract to be awarded was a hybrid Firm-Fixed-Price/Time and Materials contract. Initially, proposals were due on January 6, 2006; but, Gov Works extended that due date to January 23, 2006. Amendment 1 (December 28, 2005).

The RFP stated that the resultant contract would have a base period that would run from the time of award and end one year later, including four (4) one-year renewable options. RFP, p. 4. Furthermore, the RFP was more than 100 pages long and discussed, in significant detail, the Air Force's technical and logistical needs. In fact, Attachment 3 of the RFP, Design Specifications, was created by L-3 under Task Order 36 of the first generation Dome contract.

Under the RFP (pp. 2-4), proposals were to be evaluated with respect to (1) the offeror's Technical Proposal, which included: (A) Management Approach and Technical Capabilities; (B) Personnel Qualifications; and (C) Organizational Experience; (2) Past Performance Proposal; and, (3) Price Proposal. Though the RFP did not state the order of importance of the Technical or Past Performance Proposal, it did state that the "Technical evaluation factors are more important than price."[1] RFP, p. 4.

On December 28, 2005, GovWorks issued an amendment to the RFP. This amendment extended the closing date of the RFP until January 23, 2006, incorporating a revised pricing schedule and questions and answers into the RFP. Based on the amended RFP, offerors were to submit their pricing based on CLINS. Amendment 1 to the RFP, pp. 11-12. CLIN 0001 was the firm-fixed-price portion of the RFP, while CLINS 0002-0005 represented the time and material portion of the contract. CLIN 0006 represented the allocated travel expense for the resultant contract. Each CLIN cited a section of the Statement of Work (hereinafter "Statement of Work"

[1] The RFP stated that offerors' proposals would be evaluated "in accordance with the evaluation criteria identified in the attachment Evaluation Criteria [,]" which was not attached to the RFP.

or "SOW"), which listed certain deliverables that the Air Force expected the contractor to provide. For example:

a. CLIN 0002 required that the contractor,

> "[p]rovide a high fidelity, realistic visual environment with sensor, simulator, and semi-immersive functions with database correlation and real-time visualization techniques…"[2]

b. CLIN 0003 required that the contractor,

> "…[p]rovide integrated software, hardware, and systems engineering expertise to provide technologies of I-JATC TRS software to be transitioned to the government owned IFACT hardware or new hardware, at the testbeds…"[3]

c. CLIN 0004 required that the contractor,

> "[p]rovide software, hardware, and systems engineering expertise to design and implement technologies for the DMO environment. The technologies shall include the capabilities to interact with other DMO participants visually and via radio communications. In particular, this effort shall provide new software that is specifically suitable for IFACT DMA integration…"[4]

On or about January 17, 2006, GovWorks issued Amendment 2. Amendment 2 incorporated questions and answers into the RFP, provided the applicable NAICS code, provided Appendix C, which was inadvertently excluded from the RFP, and the notice for the January 18, 2006, site visit.

On January 23, 2006, L-3 timely submitted its proposal. As required by the RFP, L-3 in Volume 2 on pages 3-5 of its proposal included material estimates as well as labor costs. On or

---

[2] CLIN 0002 referenced paragraph 3.3 of the statement of work. Paragraph 3.3.5, a sub paragraph to 3.3. The CLIN 0002 requirement is also a deliverable under paragraph 4.3 and its sub paragraphs.

[3] CLIN 0003 references paragraphs 3.4 and 3.5 of the statement of work. Paragraph 3.4. The CLIN 0003 requirement is also a deliverable under paragraph 4.4.

[4] CLIN 0004 references paragraph 3.6 of the statement of work. Paragraph 3.6.3, a sub paragraph to 3.6, The CLIN 0004 requirement is also a deliverable under paragraph 4.6 and its sub paragraphs. Further prior to submitting its proposal L-3 entered an exclusive subcontract with Firearms Training Systems, Inc., which gave L-3 a competitive advantage over its competitors as FATS proprietary code was required to perform CLIN 0004.

about March 22, 2006, L-3 was notified by GovWorks that it had made an award to Lockheed Martin.

**THE DEBRIEFING**

On March 22, 2006, L-3 requested, in writing, a debriefing by GovWorks. By letter dated April 4, 2006, GovWorks provided a written debriefing consisting of a 3 ½ page letter. In that letter, GovWorks stated that L-3 received a Satisfactory Rating in Management Approach and Technical Capabilities, improperly listing certain "weaknesses" in L-3's proposal that kept it from receiving an Excellent rating. As will be discussed below, the proposal's weaknesses are illusory; in fact, GovWorks essentially admitted this in its Agency protest decision. L-3 received an Excellent for the Personnel Qualifications, Organizational Experience, and Past Performance factors. While no weaknesses were identified for either the Personnel Qualifications or Past Performance factors, one "non-critical" weakness with regard to key personnel resumes was identified by GovWorks, but it did not result in lowering L-3's technical score.

With respect to price, the letter stated that the award price was $1,152,313, no comparison was made to L-3's price in this letter. The letter stated that "the price proposals were analyzed by the Contracting Officer, Mr. Louis C. Williams, and a determination was made as to which proposal offered the best value to the Government." The Government determined that "Lockheed Martin Services, Inc. offer was fair and reasonable and represented the best overall value to the Government." On April 5, 2005, after receipt of GovWorks' debriefing letter, L-3 contacted GovWorks, via email to the Contracting Officer, and informed them that they had follow-up questions, which they attached to the email.

The Contracting Officer and Ms. Kathleen Engel continued the debriefing in an April 6, 2006, conference call, and informed L-3 that Lockheed Martin failed to submit pricing for

materials. L-3 was told that its evaluated price was higher than Lockheed Martin's price. On April 10, 2006, Ms. Engel and Lt. Kevin Hill, a member of the technical evaluation team had another conference call with L-3 to continue the debriefing. In response to L-3's questions with regard to the identified weaknesses in its technical proposal, Lt. Hill noted that none of the technical weaknesses were significant and admitted he made a mistake when he considered L-3's failure to budget for the ASTI Synapse Product for radio to simulation interface system a weakness.[5] Further, L-3 asked whether Lockheed Martin submitted pricing for materials and Lt. Hill then proceeded to inform L-3 that he did not want to discuss Lockheed Martin's proposal. Ms. Engel responded to L-3's question and first informed L-3 that Lockheed Martin did submit pricing for materials, but that number was "backed out" for evaluation purposes. When L-3 asked for additional information Ms. Engel then stated that she was not sure whether Lockheed Martin submitted pricing for materials and tabled the issue.

During the April 10, 2006, conference call, Ms. Engel also stated that since L-3 failed to provide sufficient detail in its Technical Proposal and that there was a need to compare the L-3 and Lockheed Martin proposals, GovWorks removed L-3's material costs from the evaluation. After the conference call, on April 10, Ms. Engel, once again, contacted L-3 and informed L-3 that Lockheed Martin failed to submit pricing for materials. GovWorks' debriefing of L-3 ended on April 10, 2006.

**Agency Level Protest**

On April 14, 2006, pursuant to Federal Acquisition Regulation ("FAR") 33.103, Protests to the Agency, and Executive Order 12979, L-3 filed an Agency level protest. GovWorks, in response, stayed contract performance. In its protest L-3 alleged that GovWorks made three

[5] The ASTI Synapse Product was to be provided as Government Furnished Property and thus should not have been budgeted for in either offerors' proposal.

substantial, material and prejudicial errors in its technical evaluation of the offerors' proposals. Specifically the errors were:

> (1) GovWorks improperly downgraded L-3's technical proposal,
>
> (2) GovWorks failed to downgrade Lockheed Martin's technically unacceptable/noncompliant proposal, and
>
> (3) GovWorks treated the offerors' proposals unequally. Further, L-3 alleged that GovWorks cost realism analysis was unreasonable and that Lockheed Martin's pricing was unrealistic and demonstrated a lack of understanding of the requirements.

As a result of these deficiencies, L-3 also alleged that GovWorks cost technical trade-off was unreasonable.

On May 22, 2006, GovWorks issued its decision denying L-3's agency protest and L-3 received the decision on the same day. In GovWorks' decision it stated, for the first time, that the weaknesses that it identified in its debriefing of L-3 as the reason L-3 did not receive an Excellent rating for its proposal were not the basis for its rating; rather, "[t]he strength of the L-3 proposal approach earned a satisfactory score." In addition, the Agency, also for the first time, stated that L-3 should not have listed the 14 major systems of the Dome it did list, but rather it should have listed all 200 known line items that were required for the original Dome that, L-3 designed. The list of 200 items, which were not included in the RFP, that GovWorks refers to in its decision was created by L-3 and was an attachment to its final report. This report, sans the attachment containing the 200 line items, was Attachment 3 to the RFP. GovWorks went on to say that it viewed L-3's failure to list these items individually as a demonstration that it did not adequately understand the requirements of the SOW. This determination was not and is not reasonable.

L-3 submitted a technical approach that nearly mirrored the Statement of Work so that the Agency could easily determine exactly what it was offering. Also, of course L-3 was aware

of all the known parts of the Dome, since it was the designer and manufacturer of the initial Dome and GovWorks was aware of this fact as it included a document created by L-3 in the RFP as Attachment 3. Furthermore, L-3 offered to use its personnel that worked on its Warfighter Task Order 36, which was awarded in January 2004. Under this task order, L-3 designed, fabricated the hardware and developed and integrated the hardware and software for the Joint Terminal Attack Controller Virtual Trainer JTAC/VT, the predecessor to "I J-TAC TRS". Its management would seamlessly transition from the Warfighter Task Order to this program, ensuring that all members of L-3's team had experience on the JTAC VT program. In fact, all of L-3's proposed team members have been part of the VT program since its inception. In addition, L-3 also proposed utilizing the technology previously developed for the Dome and develop new technology as necessary. L-3 throughout its proposal brought to bear its experience under the first generation Dome and clearly articulated its experience and excellent technical approach in its proposal.

## IV. ARGUMENT

L-3 is entitled to injunctive relief to maintain the status quo ante until the merits of its case can be considered by the Court. Assuming a contract has already been executed, if Lockheed Martin is permitted to begin performance, it would mean that L-3 would be extremely prejudiced in that it was denied an opportunity to fairly compete for award, would be required to demobilize, would potentially have to lay off a portion of its work force that worked on the first generation Dome, and L-3 would lose its exclusive subcontract with Firearms Training Systems, Inc. ("FATS"), which gave L-3 a competitive advantage over its competitors as FATS proprietary code was required to perform CLIN 0004.

### A. General Standard of Review

The Court of Federal Claims has jurisdiction to hear post-award bid protests under the Tucker Act, 28 U.S.C. § 1491(b). The Court's review of post-award bid protest actions is governed by the Administrative Procedure Act, 5 U.S.C. § 706(2), which provides in pertinent part: "The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Fru-Con Constr. Co., Inc. v. United States*, 57 Fed.Cl. 483, 485 (2003). The following four factors are to be considered by the Court to determine whether the Government has acted arbitrarily and capriciously toward the plaintiff:

1. Whether there was subjective bad faith on the part of the procuring officials thus depriving plaintiff of fair and honest consideration of its proposal;
2. Whether there was a reasonable basis for the procuring officials' decisions;
3. Whether the procuring officials abused their discretion; and
4. Whether the procuring officials violated pertinent statutes or regulations.

*Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 671 (1997).

Under the arbitrary and capricious standard,[6] which is identical to that applied by this Court under its pre-award bid protest jurisdiction, Plaintiff is entitled to relief where it can establish that the Government's actions "1) were without a reasonable basis, or 2) violated an

---

6 "In addition, an agency decision will be set aside as arbitrary and capricious if the agency has not considered all relevant factors and articulated a rational connection between the facts found and the choice made." *Antarctic Support Assocs. v. United States*, 46 Fed. Cl. 145, 154 (2000) (*citing Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246 (1983)); *NKF Eng'g, Inc. v. United States*, 9 Cl. Ct. 585, 594 (1986) ("[W]hat here condemns the contracting officer's decision, is that he failed to take into consideration critically important facts, all available to him at the time he made his decision and all of which cut the other way. A decision that fails to consider all relevant evidence is the essence of arbitrariness."), *order vacated on other grounds*, 805 F.2d 372, 378 (Fed. Cir. 1986) (*citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 81 S.Ct. 814 (1971)).

applicable procurement statute or regulation." *GraphicData, L.L.C. v. United States*, 37 Fed. Cl. 771, 779 (1997).

Reviewing courts look to whether the contracting agency can provide a coherent and reasonable explanation of its exercise of discretion. *See, e.g., MCI Telecomms. Corp. v. FCC*, 675 F.2d 408, 413 (D.C. Cir. 1982); *Environmental Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). When reviewing agency action, the Administrative Procedure Act requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Filtration Development Co., LLC v. United States*, 60 Fed.Cl. 371, 376 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16, 81 S.Ct. 814 (1971)).

**B. Standard for Interim Injunctive Relief**

In considering requests for preliminary injunctive relief, the Court must weigh the following four factors: "(1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties." *U.S. Ass'n of Importers of Textiles & Apparel v. United States*, 413 F.3d 1344, 1347-48 (Fed. Cir. 2005); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). While no single factor is determinative, the factors are to be weighed simultaneously and an injunction granted if the equities weigh in the Plaintiff's favor. This Court has found that a preliminary injunction may be warranted if:

> (i) the evidence establishes a combination of probable success on the merits and the possibility of irreparable injury; or
> (ii) the evidence adduced establishes that serious questions are raised and the balance of hardships tips sharply in the Plaintiff's favor.

*TRW Envtl. Safety Sys. v. United States*, 16 Cl. Ct. 520, 527 (1989). For purposes of preliminary injunctive relief, the burden is on the Plaintiff to demonstrate its position has a substantial likelihood of success on the merits, not a preponderance of evidence nor clear and convincing evidence. *See Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 227 (1992) (contrasting the standards for preliminary versus permanent injunctive relief); *Magellan Corp. v. United States,* 27 Fed. Cl. 446, 447 (1993) (clear and convincing evidence is not proper standard for preliminary injunctive relief inquiry). However, this factor is weighed against the other factors of irreparable harm to Plaintiff; degree of harm to other parties; and impact of injunction on public policy considerations. *Magellan Corp*, 27 Fed. Cl. at 447.

L-3 need not prove with "mathematical probability" that it will be successful in this protest. *Washington Metro. Area Transit Auth. v. Holiday Tours, Inc*, 559 F.2d 841, 843 (D.C. Cir. 1977). In fact, the Court may grant a stay even though its own view of the merits of the case differ from the movant's. *Id.* "The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." It will ordinarily be enough where the plaintiff has raised questions going to the merits "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation . . . ." *Alaska Cent. Express, Inc. v. United States*, 51 Fed. Cl. 227, 203 (2001) (*quoting Washington Metro. Area Transit Auth.*, 559 F.2d at 844). Plaintiff need not prove that it will ultimately prevail on the merits to be entitled to preliminary injunctive relief:

> To justify [an] . . . injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions . . . so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

*Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511, 526 (Fed. Cir. 1990) (*quoting Washington Metro. Area Transit Auth, supra.*)

Under the above standards, the issuance of a preliminary injunction in this case is clearly warranted. All factors favor such relief and a legitimate need exists to maintain the status quo ante until the Plaintiff can be heard on the merits of its claim.

### 1. L-3 is Likely to Prevail on the Merits Because There is Clear and Prejudicial Evaluation Errors

L-3 will prevail on the merits of this case by demonstrating that the evaluation was clearly and prejudicially flawed, arbitrary and capricious and in violation of applicable procurement laws and regulations. The likelihood of L-3 succeeding on the merits is quite strong. It has raised a number of protest issues, any one of which is in itself a sufficient basis for setting aside the award.

#### a. GovWorks' Evaluation of L-3's Technical Proposal was Improper

It is clear that GovWorks' evaluation with regard to the Management Approach and Technical Capabilities factor was erroneous. In reviewing the protest of an agency's evaluation of proposals the record must be examined to determine whether the agency's judgment was reasonable and consistent with the stated evaluation criteria and applicable procurement statutes and regulations. *See JWK Int'l Corp. v. United States*, 52 Fed.Cl. 650, 659 (2002). Where, as here, the agency's evaluation demonstrates prejudicial errors and lacks a reasonable basis, a protest must be sustained. In order to show an error was prejudicial a protester must demonstrate that but for the alleged error, there was a substantial chance it would have been awarded the contract, *see Bannum, Inc. v. United States*, 404 F.3rd 1346 (Fed Cir.

2005), or as articulated by this Court that but for the alleged error there is a reasonable likelihood that the protester would have received the award. *See KSEND v. United States*, 69 Fed. Cl. 103 (2005). Regardless of the standard applied, under the circumstances of the instant procurement, the Court must sustain this protest.

During L-3's debriefing GovWorks identified four weaknesses under Management Approach and Technical Capabilities factor.[7] These weaknesses were:

- Although not a critical factor, L-3's proposal does not demonstrate complete coverage of logistics and schedule, specifically the Clone delivery to Nellis Air Force Base.

- L-3's proposal does not adequately address Paragraph 4.2 of the SOW; specifically, the Title 50 DFARS rights.

- The estimated number of total hours to complete the Dome at Nellis AFB (CLIN 0001) seems slightly excessive for the effort of work considering the total hours required for the initial Dome.

- L-3's assumptions stated that AFRL/HEA would provide an ASTI Synapse Product for radio to simulation interface system. This should be budgeted and provided as part of L3 proposal as it was in the initial JTAC TRS effort. This will not be Government furnished equipment.

April 4, 2006, initial debriefing letter. (Attached to complaint as Exhibit 1.) Based on these weaknesses, L-3 was assigned a rating of Satisfactory for this factor. GovWorks' finding with regard to each of the above cited weaknesses, as demonstrated throughout the debriefing process, was clearly and unequivocally erroneous.

With regard to the first alleged weakness, that L-3's proposal did not demonstrate complete coverage of logistics and scheduling for Nellis Air Force Base, specifically that L-3 did not provide the level of detail that the technical evaluation team wanted to see, it was improper

[7] At no time did GovWorks request that L-3 clarify any of the concerns it had with regard to L-3's Management Approach and Technical Capabilities, which would have resolved these concerns prior to award.

for GovWorks to downgrade L-3's proposal as it provided significant detail with regard to logistics and scheduling. On page 18 of its proposal, L-3 provided a Program Schedule, Figure 1.4.1.1-1, which at lines 24-26 specifically addressed the schedule for Nellis Air Force Base. Further, L-3 discussed logistics and scheduling in detail on page 21 of its proposal under the Configuration Control and the Site Survey headings, on page 22 under the Fabrication and the Component Checkout heading, on page 23 under the Installation and Integration at AGOS, the Acceptance Testing, and the Mitigation Strategy headings, and on page 24 under the Logistic Considerations heading. In fact, L-3's description was so detailed that under the Logistic Considerations heading it even identified the type of truck it would use to ship the JTAC TRS. L-3 submitted a thorough and well written proposal that more than adequately addressed logistics and training. Accordingly, it was unreasonable for GovWorks to downgrade L-3's proposal with regard to this issue.

With respect to the second supposed weakness, that L-3's proposal did not adequately address the data rights requirement of Paragraph 4.2, there is a simple explanation for why this issue "was not addressed." L-3 viewed it as a requirement of the RFP, which did not require a specific response. Moreover, the RFP merely stated that the "government will require and own rights to executable code and will require applicable licenses." Statement of Work, Paragraph 4.2. L-3 was aware of this requirement and the others set forth in the RFP and specifically and unambiguously noted that it "takes no exceptions to the RFP terms and conditions and places no conditions upon award of the ensuing contract." L-3 Proposal, Enclosure 3, p. 1. Consequently, there was no reason to address separately the data rights issue in its technical proposal. Had the Agency made an award to L-3, as it should have, since L-3 was the only offeror who submitted a technically acceptable and compliant proposal, it would have been granted the rights requested

under Paragraph 4.2. Therefore, GovWorks considering this a weakness in L-3's proposal was unreasonable and improper.

The final two purported weaknesses identified by GovWorks were (1) the estimated number of total hours to complete the Dome at Nellis AFB seemed slightly excessive and (2) that L3 incorrectly assumed that AFRL/HEA would provide an ASTI Synapse Product for radio to simulation interface system were also improperly held against L-3. With regard to the hours estimate for CLIN 0001, GovWorks' rationale for considering the labor hours proposed a weakness is that L-3's labor hours for the initial Dome were not high enough. There are several problems with this position. First is that the initial Dome was a cost plus contract and CLIN 0001 is a firm-fixed-price line item. Consequently, one would expect that the hours proposed would be greater because the contractor bears the risk in a firm-fixed-price contract. However, it should be noted that the bid price for CLIN 0001 is less then the cost of the initial Dome. There is no rational reason why this should have been considered a weakness in L-3's proposal. With regard to the claim that L-3 should have budgeted for ASTI Synapse Product, GovWorks has conceded this should not have been considered.

In GovWorks' response to L-3's Agency level protest, GovWorks changed its position concerning the rationale for award from the weaknesses identified in its debriefing of L-3, to "[t]he strength of the L-3 proposal approach earned a satisfactory score." Agency Protest Decision, May 22, 2006 , Exhibit B hereto, (hereinafter "Agency Protest Decision") at p. 2. The Agency also for the first time claimed that L-3 should have listed all 200 known line items that were required for the original Dome (that L-3 designed), instead of the 14 major systems. The list of 200 items, which were not included in the RFP, was created by L-3 and was an attachment to its final report. This report, sans the attachment containing the 200 line items, was

Attachment 3 to the RFP. GovWorks goes on to say that it viewed L-3's failure to list these items individually -- that is, to repeat a list L-3 had created -- as a demonstration that L-3 did not adequately understand the requirements of the SOW. This determination was not and is not reasonable. To support its position GovWorks points to the initial Dome. Notwithstanding, there simply is no doubt that L-3 was aware of all the known parts as it was the designer and manufacturer of the initial Dome and GovWorks was well aware of this fact as it included a document created by L-3 as Attachment 3 of the RFP.[8] See Affidavit of Edward S. Brannum, Exhibit A hereto, (hereinafter "Brannum Affidavit") at ¶¶ 6, 11-12.

Further, GovWorks' about face and post hoc rationalization with regard to why L-3's proposal received only a Satisfactory rating raises serious questions as to exactly why L-3 actually received a Satisfactory rating. By identifying the four weaknesses and later changing its position GovWorks, for reasons known only to itself, appears to have decided to select Lockheed Martin as the awardee and thereafter craft the justification for its decision.

For the abovementioned reasons, L-3's proposal with regard to the Management Approach and Technical Capabilities factor was improperly rated as satisfactory and should have been rated Excellent as no weakness should have been charged against L-3. Furthermore, for the reasons discussed above, and stated below, it is clear that but for GovWorks' improper evaluation L-3 would have been awarded the contract.

---

[8] GovWorks gave other excuses for its conclusion that L-3 did not understand the requirement. None are sufficient and making the assumption was improper in the context here. By failing to consider L-3's experience as the developer and manufacture of the initial Dome, GovWorks failed to meet its obligation to consider all relevant information that it had in its possession and as such it acted improperly. *Cf. GTS Duratek, Inc.*, B-280511.2, B-280511.3, Oct. 19, 1998, 98-2 CPD ¶ 130 (protest sustained where agency improperly ignored relevant past performance information that was personally known to one of the evaluators, and the agency failed to comply with the solicitation's evaluation criteria with respect to the past performance evaluation). See Exhibit B.

**b. GovWorks' Evaluation of Lockheed Martin's Proposal was Improper**

It is well established that where a protestor can demonstrate that a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail, provided it can demonstrate that, but for the violation, it had a substantial chance to receive the award. *See Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999). Further, it is well settled that a technically unacceptable proposal cannot be considered for award. *See e.g., Naplesyacht.com, Inc. v. United States,* 60 Fed. Cl. 459; 471 (2004) (*citing Universal Yacht Servs., Inc.*, B-287071, B-287071.2, Apr. 4, 2001, 2001 CPD ¶ 74).[9] Lockheed Martin did not include material costs in its proposal, as required by the RFP; therefore, the Agency's evaluation of its proposal and award to Lockheed Martin was improper.

The offerors were advised that "[t]he contractor shall supply all labor and materials necessary to perform work under this Contract." See RFP § B.1. In fact, in Amendment 1 to the RFP, GovWorks listed CLINs 0002-0005[10] as time and material CLINS and cited paragraphs of the statement of work that addressed materials that the awardee would be responsible for providing. For example, CLIN 0002 references paragraph 3.3 of the Statement of Work. Paragraph 3.3.5, a sub paragraph to 3.3, required that the contractor,

> "[p]rovide a high fidelity, realistic visual environment with sensor, simulator, and semi-immersive functions with database correlation and real-time visualization techniques…"[11]

In order to satisfy this requirement an awardee would have to, at a minimum, provide and therefore include a proposed price for , rear view projectors, projection screens, PC-IG hardware,

---

[9] In fact, an offeror has an obligation to submit a proposal that fully demonstrates the technical acceptability of its offered product or service. *Compressed Air Equip.*, B-246208, Feb. 24, 1992, 92-1 CPD ¶ 220.

[10] CLIN 0005 required that the awardee deliver certain documentation to the Government.

[11] *See* note 2, *infra*.

PC-IG software, ASTI radio, and Next Generation Threat System Hardware. CLIN 0003 references paragraphs 3.4 and 3.5 of the Statement of Work. Paragraph 3.4 required that the contractor,

> "...[p]rovide integrated software, hardware, and systems engineering expertise to provide technologies of I-JATC TRS software to be transitioned to the government owned IFACT hardware or new hardware, at the testbeds..."[12]

As with CLIN 0002, the awardee would have to provide the same material under CLIN 0003, because this CLIN requires the awardee to manufacture a production unit based on the approved design. The awardee would have to deliver between one and five production units under CLIN 0003. CLIN 0004 references paragraph 3.6 of the Statement of Work. Paragraph 3.6.3, a sub paragraph to 3.6, required that the contractor,

> "[p]rovide software, hardware, and systems engineering expertise to design and implement technologies for the DMO environment. The technologies shall include the capabilities to interact with other DMO participants visually and via radio communications. In particular, this effort shall provide new software that is specifically suitable for IFACT DMA integration..."[13]

Since CLIN 0004 requires that a contractor utilize a FATS proprietary code, which L-3 had an exclusive right to pursuant to an agreement with FATS for use of this code, the awardee would have to include licensing costs under materials for CLIN 0004. Furthermore, CLIN 0004 sets forth the deliverables under the contract. Specifically, GovWorks clearly and unambiguously demonstrated that it intended offerors to bid both time and materials costs for CLINS 0002-0005.

Furthermore, a comparison of the language found in the RFP with regard to deliverables, Paragraph 4.2 of the SOW, CLIN 0001, and Paragraph 4.3 of the SOW, CLIN 0002

---

12 *See* note 3, *infra*.

13 *See* note 4, *infra*.

demonstrates that GovWorks wanted offerors to submit pricing for materials. Paragraph 4.2 of the SOW, CLIN 0001, states that for the Dome the awardee would be required to

> Deliver a replica JTAC TRS Dome environment hardware and software that provides an immersive environment for training and performance measurements of JTAC competencies.

In comparison, Paragraph 4.3 of the SOW, CLIN 0002, required the awardee to

> Deliver I-JTAC TRS Dome environment hardware and software that provides an immersive environment for training and performance measurements of JTAC competencies using either existing IFACT training system hardware, new hardware, or a combination of each.

It is undisputed that the awardee will be required to deliver an end item under CLIN 0001, which would require that the awardee utilize certain materials. See Brannum Affidavit at ¶ 10. However, GovWorks now asserts that CLIN 0002 does not require the delivery of an end item despite the fact that the SOW couches the required deliverable under CLINs 0001 and 0002 in near identical terms. This argument is not tenable. Nothing in the RFP/SOW Amendment 1 or 2 to the RFP changed the requirement that offerors are required to submit cost of materials in their proposals. In fact, CLINS 0002-0005 were time and material CLINS, and it is industry practice that in time and material contracts that offerors are required to include such costs, save the Government affirmatively stating otherwise. *See*Brannum Affidavit at ¶ 10.

During the debriefing, GovWorks at first informed L-3 that Lockheed Martin failed to include costs for material in its bid. It subsequently provided different stories before settling on the original account.[14] The purpose of this obfuscation is unclear. Nonetheless, what is clear is

---

[14] GovWorks also claimed during the debriefing, for the first time, that Amendment 1 removed the requirement to submit material costs in the instant procurement. This argument is untenable as Amendment 1 did not specifically (continued...)

that Lockheed Martin's failure to submit pricing for materials rendered its proposal technically unacceptable/noncompliant. Consequently, Lockheed Martin could not be awarded a contract without GovWorks amending the RFP, as appropriate, and opening discussions with all offerors to obtain, at a minimum, cost information on materials.

Lockheed Martin's failure to submit material costs is troubling in two additional respects. First, since Lockheed Martin was not the primary developer of the initial Dome, as L-3 was, its failure to submit material costs appears to indicate that it is unable to estimate the cost of materials. The second problem is, given the fact Lockheed Martin failed to submit pricing for materials, the contract award price does not reflect the actual cost of its performance under the contract. Not only has Lockheed Martin failed to include material costs, but it is also likely that it did not include the labor hours associated with the assembly of the materials. On the other hand, L-3's proposal gives the Government a realistic idea of what the actual cost of this procurement will be.

GovWorks in its response to L-3's Agency level protest stated that Amendment 1's questions and answers numbered 27[15], 28[16], 29[17], 30[18], and 31[19] demonstrate that offerors

---

(continued...)

amend section B.1 of the RFP or the CLINS referenced in the Amendment, which clearly and unambiguously cite paragraphs in the SOW that require the delivery of software, hardware, and other equipment, that would require materials.

15 **Question:** Reference SOW, paragraph, appendices, etc. SOW section 3.3.5 & 3.3.6, we believe that further specifying the capable boundaries of the database will allow more accurate comparisons by the Government between contractor-furnished offerings. Accordingly, we suggest the following technical specification be added or supplied as answers. What are the coordinates of the visual database bounding area (four corner points) in latitude and longitude?
**Answer:** Boundaries of the databases for the IJTAC TRS will not be defined until the evaluation effort (para 3.3.2) is completed. The IJAC TRS will be a scalable JTAC VT system driven by results of the analysis.

were not required to price materials. GovWorks Protest Decision, p. 6. None of these questions and answers removed the requirement to price materials. The only question that arguably "addresses" whether an offeror was required to provide a price for materials is one not relied upon by GovWorks: question 10.[20] The failure to rely on question 10 is proper, of course,

---

(continued...)

16 **Question:** Reference SOW, paragraph, appendices, etc. SOW section 3.3.5, 3.3.6 & 3.4, visual databases and database content can cause varying costs with respect to source data and fidelity. What are the additional databases required and to what level of fidelity is needed with respect to:

A. Source imagery resolution?
B. Number of artifacts?
C. Geo specific as opposed to geo typical?

**Answer:** Database criteria and decisions on re-hosting(s) for the IJTAC TRS will not be defined until the evaluation effort (para 3.3.2) is completed. The IJAC TRS will be a scalable JTAC VT system driven by results of the analysis.

17 **Question:** Reference SOW, paragraph, appendices, etc. SOW section 3.3.5, 3.3.6 & 3.4, level of fidelity with respect to database, projection, and environment can cause varying costs to delivery of a fielded systems. Is the level of fidelity that currently exists with the original AFRL/HEA JTAC VT Dome expected to be maintained in the garrison/I FACT units?

**Answer:** Database, projection, and environment criteria for the IJTAC TRS, as well as decisions on re-hosting, will not be defined until the evaluation effort (para 3.3.2) is completed. The IJAC TRS will be a scalable JTAC VT system driven by results of the analysis

18 **Question:** Reference SOW, paragraph, appendices, etc. SOW section 3.3.5, 3.3.6 & 3.4, level of correlation with respect to imagery/sensor correlation can cause varying costs to delivery of a fielded system. Is the level of imagery/sensor correlation that currently exists with the original AFRL/HEA JTAC VT Dome expected to be maintained in the garrison/IFACT units?

**Answer:** Imagery/sensor correlation criteria for the IJTAC TRS, as well as decisions on re-hosting, will not be defined until the evaluation effort (para 3.3.2) is completed. The IJAC TRS will be a scalable JTAC VT system driven by results of the analysis.

19 **Question:** Reference SOW, paragraph, appendices, etc. SOW section 3.3.5, 3.3.6 & 3.4, with JTAC VT, I-JTAC TRS, and IFACT possibly being platform independent. Is the level of imagery/sensor correlation that currently exists with the original AFRL/HEA JTAC VT Dome expected to be maintained across platform with the garrison/IFACT units?

**Answer:** Imagery/sensor correlation criteria for the IJTAC TRS, as well as decisions on re-hosting, will not be defined until the evaluation effort (para 3.3.2) is completed. The IJAC TRS will be a scalable JTAC VT system driven by results of the analysis.

20 Question 10 stated

**Reference:** (SOW, paragraph, appendices, etc.) 4. Deliverables 4.1.4, 4.3, 4.4, 4.5

(continued...)

because, in light of the RFP's terms and conditions, the SOW, industry custom and all the other questions and answers, question 10 could not be said to have amended the clear language of the RFP. Further, GovWorks points to the January 18, 2006,[21] site visit where it implies the issue, whether materials were to be priced was discussed. GovWorks Protest Decision, p. 7. There is no record of what was discussed during the site visit and the information disclosed at the site visit was not shared with all potential offerors, as required by regulation.[22] Therefore, again the solicitation was not amended in this way such that offerors, were put on notice that they were not required to price materials. Consequently, as is customary with time and material contracts offerors were required to explicitly price materials for CLINS 0002-0005. L-3 did so, but Lockheed Martin did not.

Given the circumstances of the instant procurement, the mere fact that GovWorks evaluated and made an award to Lockheed Martin based on its technically unacceptable proposal was *per se* unreasonable, improper and contrary to statute and regulation and highly prejudicial.

---

(continued...)

**Comment:** Hardware and software for the deliverables aforementioned can not be determined until AFRL approves the engineering design, analysis and proof of concept for the i-JTAC.

**Question:** Does the Government expect these hardware/software items to be priced or will authorization come from AFRL to procure based upon approval of the engineering design and proof of concept.

**Answer:** Yes, authorization will come from AFRL to procure hardware/software based upon approval of the engineering design and proof of concept costs. Hardware and software requirements are included in the final report. Additional specifications and/or a demonstration may be acquired by contacting Lt. Kevin Hill at 480-988-6561, ext 213.

21 In the Agency's protest decision it makes a great deal of the fact that L-3 did not attend the site visit. L-3 did not attend the site visit because the site is within L-3's designated work area and they work with the Dome on a daily basis. In other words, L-3 has an ongoing site visit everyday. Brannum Affidavit at ¶ 12

22 The FAR provides that, when specific information about an acquisition that would be necessary for the preparation of proposals is disclosed to one or more potential offerors, that information must be made available to all potential offerors in order to avoid creating an unfair competitive advantage. *See* FAR § 15.201(f).

### c. GovWorks Failed to Treat Offerors Equally

When the Agency's evaluation of L-3's proposal is compared to its evaluation of Lockheed Martin's proposal, it is clear that (a) GovWorks' evaluation of Lockheed Martin's proposal was erroneous, (b) GovWorks improperly downgraded L-3's proposal for "minor" weaknesses, while it did not penalize Lockheed Martin for major weaknesses and deficiencies in its proposal, (c) GovWorks never advised L-3 that it was not required to include the cost of materials in its proposal, and (d) the difference in treatment of Lockheed Martin and L-3 demonstrates that GovWorks treated offerors disparately.

What is so glaring is the fact that GovWorks ignored the substantial performance risk of awarding a contract to a contractor who failed to meet the basic requirements of the RFP. Moreover, GovWorks' failure to advise L-3 that the cost of materials was not required to be included in its proposal, coupled with its failure to appreciate the inter-relationship between labor and the cost of materials eliminated any chance that the evaluation of L-3's proposal would be proper. The record clearly demonstrates that the Agency's evaluation of L-3, as compared to Lockheed Martin, is illogical, disparate, and prejudicial. It is a fundamental principle of Government procurement law that competition must be conducted on an equal basis, that is, offerors must be treated equally and be provided with a common basis for the preparation of their proposals. *See Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384 (2005); *Gentex v. United States*, 58 Fed. Cl. 634 (2003). For reasons known only to it, GovWorks has chosen to evade this clear fairness requirement, not to enter into discussions, and award a contract based on a technically unacceptable proposal, ignoring a proposal that clearly and unambiguously met or exceeded the requirements of the RFP.

GovWorks could have easily rectified Lockheed Martin's failure to follow the requirements of the RFP merely by holding a round of discussions with each offeror. It could have used discussions as an occasion to amend the RFP if, after reviewing the Lockheed Martin proposal, GovWorks decided that it did not want to know the actual cost of the contract it was planning to award. The RFP did state that it was the Agency intent to make an award without holding discussions and as such it was within GovWorks' discretion not to hold discussions with the offerors. Nonetheless, GovWorks discretion not to hold discussions was not unfettered and its decision not to hold discussions must be reasonably based on the particular circumstances of the procurement, including consideration of the proposals received and the basis for the selection decision. *See The Jonathan Corp., Metro Mach. Corp.*, B-251698 *et al.*, May 17, 1993, 93-1 CPD ¶ 174 at 14. Here, it is clear there was a "disconnect" between what the Agency stated in the RFP, SOW, and Amendments and what the Agency now states it is looking for and, as such, discussions were required. In fact, even the Agency was not clear on how to evaluate the proposals price as in its initial award letter it identified L-3's price, which included its material cost, and later, during a debriefing, GovWorks stated it "backed out" L-3's proposed material cost when evaluating the proposals.[23] In a case such as this, where L-3's proposal was advantageous to the Government, GovWorks should have opened discussions, clearly stating to L-3 and other offerors, for the first time, that it did not want any offeror to price materials. For reasons known only to GovWorks, it chose not to open discussion and treat the offerors unequally.

---

[23] GovWorks did not properly perform this adjustment, which is an independent basis for setting aside the award. See Section d., infra.

Therefore, because of the clear disparate treatment of the offerors' proposals, which was highly prejudicial to L-3, and GovWorks' failure to share all relevant information with all offerors, the Court must sustain this protest.

**d. GovWorks' Cost Realism Analysis was Unreasonable and Improper**

When an agency evaluates proposals for the award of a cost-reimbursement contract, as GovWorks did in the instant procurement with regard to CLINS 0002-0005, an offeror's proposed estimated costs are not dispositive, because the offeror's estimated costs may not provide valid indications of the final actual costs that the Government is required, within certain limits, to pay. *See JWK Int'l Corp., supra* at 393; *Day & Zimmermann Servs. v. United States,* 38 Fed.Cl. 591, 597-98 (1997). Accordingly, a cost realism analysis must be performed by the agency whenever a cost-reimbursement contract is contemplated. FAR 15.404-1(d)(2). A cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance and materials described in the offeror's technical proposal. The analysis of cost realism calls for the exercise of informed judgment by the contracting agency involved, since in most procurements it is in the best position to assess the realism of proposed costs and it must bear the difficulties or additional expenses resulting from a defective cost realism analysis. In order for a cost realism analysis to be proper it must be reasonable. *JWK Int'l Corp supra*; *OMV Medical, Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000) ( The agency's cost realism analysis must reflect that it took into account the information available and did not make "irrational assumptions or critical miscalculations."). In the instant procurement, the cost realism performed by the agency could hardly be described as reasonable or based on informed judgment, but rather is based on critical miscalculations and

GovWorks' failure to take into account the inter-relationship between labor and the cost of material and the significant decrease in price that could have resulted if the costs of materials were properly removed from L-3's proposal.

In spite of multiple meetings with GovWorks and its discussion in the decision to L-3's Agency protest, GovWorks has yet to describe its cost realism analysis in any meaningful way to L-3. During the April 10, 2006, debriefing Ms. Engel stated that since L-3 failed to provide sufficient detail in its Technical Proposal and since there was the need to compare the L-3 and Lockheed Martin proposals, GovWorks removed L-3's material costs from the evaluation. Ms. Engel's logic is flawed. Even a cursory review of Concepts numbered, 1-5, found on pages 33-39 of L-3's proposal would reveal how L-3 intended to utilize the materials included in its proposal and the relationship between materials and labor. Further, simply removing the material costs does not "level the playing field" as a portion of the labor hours bid were directly associated with the materials. For example, approximately one half of the labor bid on CLIN 0002 was directly associated with utilizing the materials.

After GovWorks "backed out" the material costs it then established a new evaluated price for L-3. This number included labor and materials for CLIN 0001, but surprisingly not CLIN 0002, which even based on the Government's interpretation of the RFP required some materials, and $100,000 for CLIN 0006. GovWorks did not estimate materials for CLINs 0002-0005 for evaluation purposes. As discussed above, after a great deal of vacillation between April 6th and April 10th, GovWorks informed L-3 that Lockheed Martin failed to submit pricing for materials. GovWorks did however, create a materials estimate, which it did not disclose to L-3 but, apparently utilized to increase Lockheed Martin's cost proposal to reflect this estimate for funding purposes. The Agency also stated that this estimate was not part of the evaluation. That

being said, GovWorks never explained why it did not question Lockheed Martin's labor hour costs of $136,420 for CLINS 0002-0005, which is especially troubling when compared to L-3 significantly higher labor costs. This is especially telling as L-3 is the contractor who played a prominent role, as developer, in the manufacture of the initial Dome.

Ms. Engel's "on the fly" evaluation of L-3's proposal, less the material costs, and Lockheed Martin's proposal during the April 10 debriefing did not cure GovWorks' improper cost realism analysis. Ms. Engel attempted to demonstrate to L-3 that it was not prejudiced by GovWorks unreasonable cost realism analysis. However, in doing so GovWorks merely conducted a second unreasonable cost realism analysis. Given the fact that the materials and labor hours are inextricably connected, merely backing out the materials would not remove the severely prejudicial impact of evaluating L-3's cost proposal against Lockheed Martin's cost proposal. GovWorks completely disregarded L-3's experience with pricing the tasks necessary to perform this contract and in fact ignored its own interpretation of the RFP when performing the cost realism analysis as CLIN 0002 would require materials, yet no material estimate was used nor did Lockheed Martin even submit pricing for materials for this CLIN. Consequently, based on the foregoing information, GovWorks cost realism analysis in the instant procurement was unreasonable, based on critical miscalculations, arbitrary and capricious and contrary to statute and regulations.

### c. GovWorks' Best Value Determination Was Improper

As explained above, GovWorks' technical evaluations of L-3's and Lockheed Martin's proposals were improper, arbitrary and capricious. This coupled with its unreasonable cost realism analysis of Lockheed Martin's cost proposal and the unequal treatment of offerors rendered GovWorks' evaluation of the offerors unreasonable. Furthermore, had L-3 been told that the cost of materials would not be required to be included in its proposal, it would have proposed a lower price than that proposed by Lockheed Martin.[24] Given the unreasonable evaluation, any award determination based thereon is itself unreasonable and could not be properly documented by GovWorks. *See Future-Tec Mgmt. Sys., Inc.; Computer & Hi-Tech Mgmt., Inc.*, B-283793.5, B-283793.6, Mar. 20, 2000, 2000 CPD ¶ 59 at 7 (Agencies must adequately document the reasons for their evaluation conclusions.); *see also* FAR 15.305(a)(3)(i)-(ii).

It is axiomatic that an award determination based upon erroneous information is *per se* unreasonable. For example, a cost/technical tradeoff that is based on a defective technical evaluation is itself defective and cannot be upheld. *SeaSpace*, B- 241,564, Feb. 15, 1991, 70 Comp. Gen. 268, 91-1 CPD ¶ 179; *U.S. Sprint Communications Co., Ltd. Partnership*, B-243767, Aug. 27, 1991, 91-2 CPD ¶ 201 (elimination from competitive range unreasonable where based on erroneous information); *Eigen*, B-249860, Dec, 21, 1992, 92-2 CPD ¶ 426 (contract award improper where cost/technical trade-off decision was not based on actual price difference between offerors). In other words, an evaluation of offerors' proposals, and the determination as to which proposal represents the best overall value to the Government, must be

---

24 We will provide a chart indicating L-3's lower price once a Protective Order is issued by the Court.

based on the true and correct differences between the proposals not on erroneous or misleading information. *Bendix Oceanics, Inc.*, B-247225.3, July 27, 1992, 92-2 CPD ¶ 5.

In its protest decision GovWorks states that it was not required to perform a cost technical trade-off in the instant procurement because it awarded to what it viewed as the highest technically rated lowest price offeror. GovWorks Protest Decision p. 10. Nonetheless, where an agency awards to the highest technically rated lowest price offeror it still must document its award decision. Further, an agency must show that it did not rely solely on the adjectival rating when making its award decision. *Johnson Controls World Servs., Inc.*, B-289942, B-289942.2, May 24, 2002, 2002 CPD ¶ 88 at 6 ( GAO sustained a protest where the agency took an overly mechanistic approach when comparing two offerors past performance and failed to consider the qualitative differences between the offerors.) It must look behind the rating when determining which offeror represents the best value to the Government. Based on the record, it appears that GovWorks utilized an overly mechanistic approach in determining which offeror represented the best value to the Government and failed to properly document its award decision and, as such, acted improperly. Moreover, had L-3 been permitted to submit a proposal that did not include the cost of materials, GovWorks would have been required to perform a cost technical trade-off since Lockheed Martin would not have been the lowest price offeror.

Here, it is clear that GovWorks' evaluation of the proposals was fundamentally flawed. Accordingly, any reliance on the conclusion derived therefrom to support its best value analysis renders the award decision unreasonable.

### 2. L-3 Will Suffer Irreparable Harm if Injunctive Relief is Denied Because L-3 Will Have Been Denied the Opportunity to Fairly Compete for Award; L-3 Will be Forced to Terminate a Part of its Workforce and Will be Forced to Demobilize

L-3 will suffer irreparable injury if it is denied injunctive relief, because it will have been denied the opportunity to fairly compete for award, in that GovWorks' evaluation was improper, contrary to statute, regulation and the solicitation terms, and highly prejudicial to L-3. L-3 does not have an adequate remedy at law and interim injunctive relief is therefore appropriate. Unless execution of the contract and/or contract performance is enjoined, L-3 will be significantly damaged even if award of the entire contract is subsequently directed to L-3 by this Court.

Initially, L-3 will suffer irreparable injury if it is denied injunctive relief because it will be denied the opportunity to fairly compete for award. Moreover, there will be irreparable harm to L-3 even if an award were subsequently directed by this Court because, pending resolution of the case, L-3 will be forced to layoff and/or terminate a part of its workforce, if it is not performing the contract, causing a significant loss in intellectual capital. *See* Affidavit of David F. Williams, Exhibit C hereto (hereinafter "Williams Affidavit"), at ¶¶ 5-6. The demobilization of L-3's workforce will also be disruptive to both L-3 and the Government. Further, L-3's exclusive subcontract with FATS, which gave L-3 a competitive advantage over its competitors as FATS proprietary code was required to perform CLIN 0004, would be terminated if Lockheed Martin is permitted to commence performance of the JTAC TRS contract. Williams Affidavit at ¶ 7; *see cf. University Research Co., LLC, v. United States*, 65 Fed.Cl. 500 (2005) (Loss of lease and services contracts and loss of contracts with internet service providers if preliminary injunctive relief is not granted is a factor to consider when determining irreparable harm.)

Moreover, if L-3 loses the contract because GovWorks has performed an improper evaluation, it will lose profits from the contract. As this Court stated in *Magnavox Elec. Sys.*

*Co.*, 26 Cl. Ct. 1373, 1379 (1992), this showing is sufficient to prove irreparable injury. Specifically, the Court stated the following:

> [A] plaintiff moving for [a] preliminary injunction need only allege, in order to establish irreparable injury, that by failing to enjoin, it will not be awarded the contract and will lose profits hereunder. [This is] based upon the proposition that an unsuccessful bidder's damages are limited at law to bid preparation costs.

*Id. (quoting TRW Envtl. Safety Sys.*, 16 Cl. Ct. at 529); *see Hospital Klean of Texas, Inc. v. United States,* 65 Fed.Cl. 618, 624 (2005 ) (The court found, in part that, allegations of lost profits was sufficient to constitute irreparable harm.)

In addition, as this Court has noted, irreparable injury may also be found in the denial of the right to have a bid fairly and lawfully considered. *Ellsworth Assoc., Inc. v. United States*, 45 Fed. Cl. 388, 398 (1999). Here, GovWorks has, for reasons known only to it, decided to unfairly and improperly evaluate L-3's proposal, including but not limited to improperly awarding a contract to Lockheed Martin, based on its technically unacceptable/noncompliant proposal, which failed to include material costs as required by the RFP. Under the circumstances, there is no doubt that GovWorks has not "fairly and lawfully considered" L-3's offer.

For these reasons, the harm to L-3 is irreparable unless award of the contract to Lockheed Martin or performance under the contract is enjoined. Injunctive relief is therefore necessary to keep the status quo, to insure that an ultimate remedy is available.

**3. The Balance of Hardships on all the Parties Favors L-3 Because the Procurement Was Improperly Conducted**

The significant and irreparable injury that L-3 will suffer if not granted the injunctive relief sought herein far outweighs any potential harm to other parties. Indeed, as detailed above, among the harms that L-3 will suffer in the absence of injunctive relief is that (1) it will be denied the opportunity to fairly compete for award; (2) it will be forced to layoff and/or terminate a part of its workforce at the conclusion of its current contract; (3) L-3's exclusive subcontract with FATS, which gave L-3 a competitive advantage over its competitors as FATS proprietary code was required to perform CLIN 0004, would be terminated, and (4) it will lose the profits from the contract.

Not only will L-3 be significantly harmed if the contract is executed and performed as currently planned, but GovWorks' customer, the Air Force, also will suffer significant harm in the absence of immediate injunctive relief. In particular, as described more fully above, the Air Force did not receive the best value.

It further is in GovWorks' interest to not permit Lockheed Martin to begin contract performance until a hearing on the merits is held. Indeed, if Lockheed Martin were to begin performance, and the Court were then to determine that the award was improper, GovWorks could incur termination for convenience costs. GovWorks' customer, the Air Force, also would be significantly disrupted due to the immediate loss of substantial institutional knowledge, since L-3, the designer of the first generation Dome, will not be working on the second generation Dome as a result of an unfair competition.

In short, if this Court were to deny the motion for a preliminary injunction, and thereafter L-3 were to be successful on the merits, the resulting delays and extra costs to all parties, including the public, will be exacerbated if Lockheed Martin has already been awarded the

contract and has begun performance thereunder. *TRW Envtl. Safety Sys.*, 16 Cl. Ct. at 529 (discussing how the Court in the past had held that the "plaintiff's need 'to engage in extensive post-award activities to restore the status quo' constitutes immediate and irreparable harm warranting a grant of a preliminary injunction") (quoting *Sterlingwear of Boston, Inc. v. United States*, 10 Cl. Ct. 644, 649 (1986)).

On the other hand, the potential harm to GovWorks and Lockheed Martin if injunctive relief is awarded is minimal at best. First, the Court is quite capable of addressing the merits of this action in an expeditious and efficient manner, and consequently, "any delay resulting from a preliminary injunction will be short-lived." *Magnavox Elec. Sys.*, 26 Cl. Ct. at 1384. Second, GovWorks stayed performance, as required by FAR 33.103(f)(3), of the award from April 14, 2006, when L-3 protested the GovWorks' award decision, to at least May 22, 2006, the date of GovWorks Protest Decision. GovWorks made no attempt to override this stay for either urgent and compelling reasons nor did it argue that it would be in the best interest of the Government to continue with the award to Lockheed Martin. For thirty eight (38) days GovWorks has stayed performance with no harm to the Government and as such a continued suspension of performance until this protest is resolved will likely cause no harm to the Government.

Finally, the potential harm to Lockheed Martin is minimal at best. First, because the contract only was awarded a short time ago, Lockheed Martin presumably has not yet begun performance and presumably has not yet incurred any start-up costs. Furthermore, Lockheed Martin received an award it did not deserve, and consequently should not benefit from GovWorks' errors.

Under the circumstances, the balance of hardship tilts in favor of L-3. *See Magnavox Elec. Sys.*, *supra* ("The harm caused by … minimal delay in the procurement is outweighed by

the harm plaintiff will suffer if it is illegally and unreasonably denied fair and honest consideration for the contract award.").

**4. Injunctive Relief Will Serve The Public's Interest**

The public has a substantial interest in maintaining the integrity of the federal procurement process. That interest is best served by requiring the Government to adhere to all applicable statutes and regulations in its conduct of a procurement. *Magnavox Elec. Sys. Co., supra* at 1385. An injunction here would serve the purpose that the Magnavox court recognized: "ensur[ing] that procurement officials [keep] the public interest in mind -- by preserving the integrity of the procurement process and promoting competition for government contracts..." *Id.*

This Court has long recognized that the public interest lies in honest, open and fair competition in public procurement. *Magellan Corp., supra* at 448. In addition, "the public interest is served by allowing the government to proceed with contracts awarded in a manner consistent with fair and open competition, to the contractor offering the best value." *Labat-Anderson v. United States*, 50 Fed. Cl. 99, 110 (2001) (*citing JWK Int'l Corp. v. United States*, 49 Fed. Cl. 364, 370 (2001)). Here, L-3 was improperly denied the ability to fairly compete for a major contract. There is no doubt that it was the best value offeror since, L-3 is the only offeror whose proposal met the mandatory requirements of the RFP. Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid. *See Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000); *Cincom Systems, Inc., supra* at 269 (1997) ("It is axiomatic that the public has an interest in honest, open, and fair competition in the procurement process."); *Magellan, supra*. Abuse of discretion by an agency in evaluating bid proposals compromises the public interest in honest, open, and fair competition in the procurement process. Furthermore,

the public interest is manifest in ensuring that the Government closely adhere to the requirements of the procurement regulations. *See Overstreet Elec. Co.*, 47 Fed. Cl. at 744 (*citing Scanwell Lab., Inc. v Shaffer*, 424 F.2d 859, 866-67 (D.C. Cir. 1970)).

For these reasons, granting preliminary injunctive relief to maintain the status quo, and to keep the offerors in the same position until the case can be resolved, will serve to protect the integrity of the federal procurement system and is clearly in the public interest.

## V. CONCLUSION AND RELIEF REQUESTED

As detailed above, L-3 has demonstrated that there is a strong likelihood that it will prevail on the merits of its protest. In addition, if injunctive relief is not granted, Plaintiff will suffer immediate and irreparable harm because it will be forced to lay off employees, it will lose its exclusive subcontract with FATS, which gave L-3 a competitive advantage over its competitors as FATS proprietary code was required to perform CLIN 0004, and it will lose profits from the contract. Further, L-3 has shown that the issuance of a preliminary injunction will not cause substantial harm to GovWorks or Lockheed Martin. And finally, the issuance of an injunction in this case serves the public interest by promoting the fairness and integrity of the federal procurement system.

For the foregoing reasons, L-3 respectfully requests that this Court grant immediate injunctive relief in the form of a Temporary Restraining Order and Preliminary Injunction to remain in effect until this Court renders a decision on the merits.

Respectfully Submitted,

Michael A. Hordell
PEPPER HAMILTON LLP
600 14th Street, N.W., Suite 500
Washington, DC 20005-2004
Telephone: (202) 220-1200
Facsimile: (202) 220-1665
Attorney for L-3 Communications Corporation
Link Simulation & Training Division

Of Counsel
Charles H. Carpenter
Sean P. Bamford
PEPPER HAMILTON LLP

Dated: May 30, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| L-3 COMMUNICATIONS CORP.<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR<br><br>Defendant. | ) | No. __________<br>Judge: __________ |

**<u>AFFIDAVIT OF EDWARD S. BRANNUM</u>**

I, Edward S. Brannum, hereby declare as follows:

1. I am Program Manager and Proposal Manager for the Interim Joint Terminal Attack Controller Training and Rehearsal System I-JTAC(TRS) Program. My address is 5950 South Sossman Road, Suite 102, Mesa, AZ 85212. My phone number is (480) 988-5241.

2. I have worked for L-3 and its predecessor Raytheon since November 1998 and have been Transition Manager of the E-3 Program and Program Manager of the C-141 Air Crew Training Program

3. I have a Bachelor of Science Degree from the University of Alabama, a Master of Arts Degree in Management from Central Michigan University and have spent two years in a PhD Program in Organization and Management at Capella University.

4. Prior to my employment at L-3, I worked in the training and simulation field for Boeing, FlightSafety and McDonald Douglas for 2 years in a variety of positions. I completed a 30-year Air Force career in 1996, retiring as a Colonel. In the Air Force, I occupied several

command positions as well as positions at Headquarters United States Air Force in the Pentagon.

5. L-3 has been the prime contractor at the Air Force Research Laboratory commonly known as the "Warfighter Lab" in Mesa, Arizona since 1995. The Warfighter Lab's purpose is to perform research to deliver training technology to train the Warfighter. L-3, with its team members Lockheed Martin and Boeing was the successful bidder in a recent competition and was awarded another 6 1/2 year contract beginning in July 2005 to run the Warfighter Lab for the Air Force.

6. In approximately January 2004, L-3 was awarded a task order under the Warfighter prime contract to design, fabricate the hardware and develop and integrate the hardware and software for the Joint Terminal Attack Controller Virtual Trainer ("JTAC/VT") the predecessor to "I J-TAC TRS". The I JTAC/TRS is simply a scaled down deployable version of the JTAC/VT designed and fabricated by L-3 under the Warfighter Lab prime contract.

7. In August 2005, the Air Force because of expiring funding issues could not use the Warfighter contract to update the software and hardware for the I-JTAC/TRS and decided to utilize Networld Exchange Corporation's Open Market corridor contract as a contracting agency for the I-JTAC/TRS work. Initially, Networld issued a RFP for the software update I-JTAC/TRS on Friday September 2, 2005, with a proposal due date of Monday September 12, 2005. On September 6, 2005, L-3 was discussing terms and conditions associated with becoming a registered Networld vendor when Jay Carroll, the POQAR at Mesa for the Warfighter contract assured L-3 that the I-JTAC funds would be moved to and competed out of the Veterans Administration. As a result of the information, L-3 did not respond to the RFP.

The move to the Veterans Administration did not happen and DAS was awarded the software contract of approximately 1 million dollars on September 12, 2005, as the only offeror.

8. In December 2005 Mr. Jay Carroll, the Warfighter Lab Project Office Quality Assurance Representative, convened a meeting and invited representatives of DAS, L-3, and Lockheed Martin. At the meeting Mr. Carroll stated that it was clear to the Government that DAS could not perform the software contract without technical assistance from L-3 and Lockheed Martin and stated that L-3 and Lockheed Martin should be placed under subcontract to DAS. Despite giving DAS a subcontract proposal on February 9, 2006, L-3 has not been placed under contract.

9. On December 12, 2005 GovWorks issued a second RFP for I-JTAC/TRS. The RFP is divided into two parts: Firm-Fixed-Price ("FFP") Contract for the "Clone Dome" which is an exact replica of the JTAC/VT dome and Time and Material Contract for the Study (CLIN 0002) for the Test and Evaluation of one Proof of Concept developed under CLIN 0002 and the software and hardware build of five I-JTAC/TRS systems for delivery to five potential users, four in CONUS and one in Europe.

10. I have reviewed in detail the Government's response to L-3's Agency protest, it wrongly claims that the RFP did not require material for the "Time and Material" portion of the contract. I am thoroughly familiar with the RFP and under Section 4 Deliverables at paragraphs 4.2, 4.3 and 4.4, which uses the exact same words for the successful offeror to "deliver …hardware and software," material is required to be priced. Paragraph 4.2 is FFP; 4.3 and 4.4 are Time and Material. It is industry practice that in time and material contracts offerors are required to include material costs in their proposals unless the Government affirmatively states otherwise.

11. The Government's response claims L-3 has a lack of understanding of the material necessary to build the "Clone Dome". As stated above L-3 was the prime contractor for JTAC/VT of which the "Clone Dome" is an exact replica. Attachment 3 of the GovWorks RFP is L-3's Final Report for the J-TAC/VT program which describes exactly how to build the JTAC VT dome in detail in terms of design and specifications for the hardware and software. Further, the author of the L-3 Final Report was Seth G. Wilson who is named at page 4 in L-3's I-JTAC/TRS proposal as the L-3 JTAC/TRS Project Lead.

12. Disingenuously, GovWorks, in its denial of L-3's protest at Page 3, Paragraph 1 states L-3:

> "Instead of covering the more than 200 known line items required for the original dome, L-3 only listed 14 hardware line items in its proposal. Furthermore, L-3 summed these 14 items into one generic cost line and did not price them out individually. L-3 did not provide the level of detail needed to earn a Very Good or Excellent score. The Government viewed the failure to list critical hardware line items as an inadequate demonstration of understanding the requirements of the SOW and a moderate risk to the Government".

L-3, as the contractor for the J-TAC/VT program, was the author of the list of hardware items that was part of the Final Report for Task Order 36 that the GovWorks now cites (for the first time) as proof L-3 did not understand the hardware requirement for the "Clone Dome".

GovWorks attempts in its denial of L-3 protest to portray L-3 as cavalier for not attending the Site Visit on January 11, 2006. As stated above L-3 was the developer of the

JTAC/VT which is primarily located in L-3's designated area at the Warfighter Lab and under L-3 custody and control. In other words, L-3 has an ongoing site visit everyday. Additionally the Government cites discussions with only one offeror present concerning proposal requirements. A contracting officer was not present for their discussions and the information was not provided to other offerors.

VERIFICATION UNDER 28 U.S.C. § 1746

I, Edward S. Brannum, affirm under penalty of perjury this 30th day of May, 2006, that the foregoing is true and correct.

Edward S. Brannum

Edward S. Brannum

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

May 22, 2006

Michael A. Hordell
Pepper Hamilton LLP
Attorneys at Law
Hamilton Square
600 Fourteenth Street, N.W.
Washington, DC 20005-2004

Re: Protest of L-3 Communications Corporation, Link Simulation & Training Division of an Award of a Contract Pursuant to Request for Proposals Number 60246

Dear Mr. Hordell:

The Government offers the following response regarding L-3 Communications Letter of Protest of the award of the Joint Terminal Attack Control Training and Rehearsal System (JTAC TRS) contract to Lockheed Martin. L-3 Communications' protest is based on three grounds: A) The GovWorks' technical evaluation of the offerors proposals was improper, unreasonable, arbitrary and capricious; B) GovWorks failed to conduct a reasonable cost realism analysis; and, C) GovWorks failed to conduct a rational cost technical tradeoff. All three grounds are denied as follows:

**A. THE GOVWORKS TECHNICAL EVALUATION OF THE OFFERORS PROPOSALS WAS IMPROPER, UNREASONABLE, ARBITRARY AND CAPRICIOUS.**

**Contracting Officer Response: Denied in its entirety.**

For clarification purposes, GovWorks did not evaluate or score the technical proposals. An evaluation team consisting of a cross-section of five Air Force Research Laboratory, Human Effectiveness Directorate, Warfighter Readiness Division (AFRL/HEA) technical experts evaluated the proposals, documented their evaluation and provided the GovWorks Contracting Officer with a report of their evaluation and scores. The Contracting Officer reviewed the report to ensure the evaluation and scoring was fair, supported by documentation and in accordance with the technical evaluation criteria. The Contracting Officer based the best value decision on the evaluation performed by the technical experts. The Contracting Officer did not change the scoring of the technical experts nor add a GovWorks' score to the technical evaluation.

The role of bid protests within the procurement system is to ensure that agencies' evaluations are reasonable and consistent with stated evaluation criteria and relevant statutes and regulations. *See International Marine Prods., Inc.*, B-296127, 2005 CPD ¶ 119 (June 13, 2005).

It is well established that mere disagreement with an agency's technical evaluation is not grounds for sustaining a protest, and it is incumbent upon the protestor to demonstrate that an evaluation

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

was unreasonable. *See Knoll, Inc., Steelcase, Inc.*, B-294986/3, B-2986.4, 2005 CPD ¶ 63 (March 18, 2005) ("To the extent that the protesters disagree with the agency's reasonable evaluation, their mere disagreement with the agency's conclusions does not render the evaluation unreasonable."); *see also HMX, Inc.*, B-291102, 2003 CPD ¶ 52 (November 4, 2002).

L-3 claims the technical evaluation was improper based on three assumptions: 1) GovWorks improperly downgraded L-3's technical proposal; 2) GovWorks failed to downgrade Lockheed Martin's technically unacceptable proposal; and, 3) GovWorks treated the offerors' proposals unequally. All of these assumptions are false and explained below:

**A.1. GovWorks Improperly Downgraded L-3's Technical Proposal**

In general, the technical evaluation team viewed the L-3 proposal as Satisfactory because it did not find evidence to support a higher rating. Moreover, in some instances, L-3's proposal lacked some details to raise it above a Satisfactory score.

Contrary to L-3's position, "an offeror's blanket offer of compliance is not an adequate substitute for detailed and complete technical information in a proposal establishing that what the firm proposes will meet the Government's needs… An agency may downgrade a proposal for lack of detail pertaining to the requirements of an RFP, or consider a more detailed proposal superior." *See Medland Controls, Inc.*, 1994 WL 158103 (Comp. Gen., Nov. 17, 1994).

Rather, "it is an offeror's responsibility to submit a well-written proposal, with adequately detailed information, which clearly demonstrates compliance with the solicitation requirement." *See CACI Technologies, Inc.*, 2005 WL 3143443 (Comp. Gen., Oct. 27, 2005) (protester's proposal was not eligible for award because it failed to describe how the offeror intended to comply with a solicitation requirement regarding engineering services).

The Government did not downgrade L-3's proposal. The protest claims that "based on these weaknesses L-3 was assigned a rating of Satisfactory for this factor." The Satisfactory score was not based solely on the weaknesses discussed during the debriefing. Rather, the Satisfactory score was based on the overall strength of L-3's approach. L-3 did not adequately demonstrate its knowledge in its proposal. Additionally, L-3 failed to provide details for required hardware line items and specific methods and techniques for completing each task. Lastly, L-3's proposal failed to demonstrate an understanding of logistics and schedule. Therefore, the evaluation team of technical experts could only rate L-3's approach an overall Satisfactory.

This is not a situation where the technical approach would have been rated Excellent, but the weaknesses "downgraded" it to Satisfactory. Rather, the technical approach overall was Satisfactory. The weaknesses identified during the debriefing did not result in downgrading an otherwise Excellent score. The strength of the L-3 technical approach earned a Satisfactory score.

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

Instead of covering the more than 200 known line items required for the original dome, L-3 only listed 14 hardware line items in its proposal. Furthermore, L-3 summed these 14 items into one generic cost line and did not price them out individually. L-3 did not provide the level of detail needed to earn a Very Good or Excellent score. The Government viewed the failure to list critical hardware line items as an inadequate demonstration of understanding the requirements of the SOW and a moderate risk to the Government.

<u>L-3's proposal does not demonstrate complete coverage of logistics and schedule, specifically the Clone delivery to Nellis Air Force Base.</u>

The L-3 proposal did not provide adequate details on the logistics and schedule of shipping the Clone Dome (CLIN 0001) exemplar from L-3's facilities at Mesa to Nellis AFB in accordance with the RFP. Additionally, L-3's proposal did not provide construction material details for the actual Dome portion of the system in accordance with the RFP. These details were not provided by L-3 in addition to applicable vendor information. Therefore, the technical evaluation team viewed L-3's failure to list logistics, scheduling, construction material and vendor information as an inadequate demonstration of understanding the requirements of the SOW and a moderate risk to the Government.

Specifically, L-3's proposal did not provide details of the construction materials for the actual Dome portion of the system. There were no details, pricing or scheduling provided on vendor information, construction materials, procurement schedules and other logistics issues. L-3 only provided a final/total cost and a schedule completion date (page 18). For example: on page 21 of L-3's proposal states, "Link will procure all required hardware, software, and licenses required to fabricate the replica JTAC VT system." The technical evaluation team did not/could not assume L-3 understood the requirement. Because L-3 did not list all the hardware, software, and licenses required to fabricate the replica JTAC VT system, the evaluation team documented the weakness.

The evaluation team also found that the major components (page 21 & 22 of L3's proposal) in L-3's proposal were too generic, inadequate and incomplete. On page 22 ("Figure 1.4.2 1-2, JTAC VT Hardware") of L-3's proposal the description of the dome display was simply the "dome structure". This description is grossly inadequate; there is no breakdown of what the dome structure entails found in its proposal. The evaluation team could not assume L-3 was knowledgeable about all the components of the dome structure when the components were not included in the proposal; the evaluation team found that L-3 proposal did not adequately demonstrate a more than Satisfactory understanding of the requirements.

The need for transporting the JTAC VT from "the Mesa facility to AGOS" by using "a single 53-foot commercial tractor trailer" was covered in paragraph 1.4.2.4 (page 24) of its proposal. However, L-3 did not price the cost for a trailer or list time of delivery in the schedule. L-3's price proposal did not list a 53-foot commercial tractor trailer. L-3's schedule did not allocate time for delivery of fabrication material to AGOS (page 18); entire coverage of the "Replica

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

Dome (FP)" went from "Finalized JTAC configuration" (line 21), to "Site Survey" (line 22), to "Fabrication" (line 23) to "Installation/Assembly (AGOS)" (line 24).

L-3's coverage of "installation and integration at AGOS (page 23)" does not cover documentation of installation and reassembly. This shortfall (and subsequent risk) would have been acceptable had L3 included the Title 50 DFARS requirement listed in the SOW; the Government would own the installation and reassembly documentation.

The site visit date and time was published as Amendment 2 on 1/11/2006. L-3 did not attend the site visit. The intent of the site visit was to familiarize offerors more thoroughly with the requirement. The logistics, scheduling and construction materials were discussed at the January 18, 2006 site visit. By choosing not to attend the site visit, L-3 assumed the risk of not being as thoroughly familiar with the requirement. In addition, all questions and answers were posted on Amendment 1 including information regarding materials and CLINs 0002 through 0005. L-3 did not request clarification regarding the pricing.

L-3's proposal does not adequately address Paragraph 4.2 of the SOW; specifically, the Title 50 DFARS rights.

The Government did not downgrade L-3's proposal, rather the quality of the information provided in the proposal earned a Satisfactory score. The Government rated L-3's proposal in accordance with the information provided in the RFP instructions.

During the debrief teleconference, L-3 stated that because it took no exception to the RFP terms and conditions, it should not be downgraded for failing to specifically address Title 50 DFARS right. On the contrary, it is evident this acknowledgement was important to AFRL/HEA as references to Title 50 DFARS rights appears six times between sections 4.1.4 through 4.6 of the SOW. Therefore, it is reasonable to expect an offeror to acknowledge the Title 50 DFARS rights. In the opinion of the technical evaluation team, failure to adequately address the Title 50 DFARS demonstrated a lack of understanding of the requirement. Again, this is not a situation where the technical approach would have been rated Excellent, but the weaknesses "downgraded" it to Satisfactory. Rather, the technical approach overall was Satisfactory. The weaknesses identified during the debriefing did not result in downgrading the overall score.

The estimated number of total hours to complete the Dome at Nellis AFB seems slightly excessive for the effort of work considering the total hours required for the initial Dome.

The research and development (R&D) hours for the original dome were 2888 hours. L-3 proposed 2870 hours (not including 410 hours for administration support) for the replica dome. The technical evaluation team expected the second build to require fewer man-hours than the man-hours required for the original R&D procurement.

L-3's assumptions stated that AFRL/HEA would provide an ASTI Synapse Product for radio to simulation interface system.

The evaluation team representative at the debriefing, stated the team believed this product should have been budgeted and provided as part of L-3's proposal as it was in a previous JTAC TRS effort. The Final Report for JCAS, (Attachment 3 to the RFP), page 27, Figure 3-9 depicts a concept presented by the Subject Matter Experts (SMEs) on their design for the Integrated JTAC VT System. The ASTI is clearly included in the requirements schematic and therefore should have been considered a critical hardware item. Page 29, Paragraph 3.6.3.3 of the Final Report lists the sub-systems of the final JTAC VT configuration. Note that the ASTI is the referenced "Radio Communications Interface" that was included in the requirements schematic on page 27. Lastly, Figure 0-19, Final Integrated JTAC VT System Block Diagram, includes the ASTI in the requirements schematic.

L-3 raised a valid point during the debriefing regarding the requirement to provide the ASTI Synapse Product. L-3's statement that this assumption should not have been an evaluation factor may have minor merit. The Government recognizes it should have removed this requirement. Although this is a flaw in the evaluation criteria, each of the proposals were rated equally. It was not capriciously applied to L-3's proposal, but was equally applied to all proposals, each of which was rated fairly. This weakness was also noted in the Lockheed Martin technical evaluation and was considered minor for both offerors. This weakness was also noted in the Lockheed Martin technical evaluation and was considered minor for both offerors.

In addition, the evaluation team representative and the Contracting Officer take exception to the footnote on Page 8 of the protest. The technical evaluation team representative rated the L-3 approach as Satisfactory and did **not** state during the debriefing that the proposal "should have been rated exceptional for the Management Approach and Technical Capabilities factor." "Exceptional" was not one of the adjectival ratings used in the evaluation, and the Satisfactory score was based on the proposal's overall technical approach rather than this minor weakness. The Satisfactory score is not influence by this flaw in the evaluation.

Based on the aforementioned information, it is evident GovWorks did not improperly downgrade L-3's proposal because of a few minor weaknesses. The evaluation team consisting of a cross-section of AFRL/HEA technical experts fairly evaluated each offer. The technical evaluation team believes the L-3 offer earned an overall Satisfactory score under the Management Approach and Technical Capabilities section.

**A.2. GovWorks Failed to Downgrade Lockheed Martin's Technically Unacceptable Proposal.**

GovWorks does not believe L-3 has, or should have, access to Lockheed Martin's proposal and therefore L-3 is not in a position to determine the acceptability of Lockheed Martin's proposal. L-3 claims the RFP required offerors to speculate and include material costs under CLINs 0002 through 0005. On the contrary, the materials cannot be estimated until the analysis under 3.3.2 of the SOW is completed. To support its contention that the RFP requires offerors to submit material costs, L-3 cites paragraphs 3.3.5, 3.4 and 3.6 of the RFP, which L-3 maintains addresses

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

materials. (See L-3 Protest at 9-10). However, as the RFP and Amendment 1 illustrate, the materials requirements set forth in those paragraphs are only determined **after** the evaluation effort described in RFP ¶ 3.3.2 is completed. (See Amendment 1, Questions 27, 28, 29, 30 and 31 which was published on 12/28/2005). Because the analysis under CLIN 0002 is not yet completed material requirements have not yet been determined. Therefore, it is not described in RFP ¶ 3.3.2. AFRL/HEA believed it would be unreasonable to expect offerors to propose materials until the results of the analysis were published. The SOW states under CLIN 0002 section 3.3.3 that, "This proof of concept will be driven by results from the analysis of the current JTAC TRS and IFACT systems." Material purchases under CLINs 0003 through 0005 are also dependent on the completion of CLIN 0002 analysis as stated in 3.3. "Key technology challenges for this will be the development of deployable visualization and JTAC toolkit interaction to support garrison/deployable training and rehearsal by using existing JTAC training system hardware, recommending and procuring new hardware, or a combination of each."

Additionally, Schedule B details the line items for developing cost information and does not require a breakout of material costs for CLINs 0002 – 0005. L-3 protest (Page 12) claims that its "proposal gives the Government a realistic idea of what the actual cost of this procurement will be." However, L-3 did not, and could not, provide details for their proposed material costs in CLINs 0002 -0005. The Government could not accept these cost estimates as valid without any details. Furthermore, these estimates were not solicited as they cannot be defined until the analysis is completed (reference SOW 3.3.2). The technical evaluation team reviewed the offerors' pricing and the Lockheed Martin pricing was found to be reasonable to perform the requirement. L-3's unsolicited materials for CLINs 0002-0005 did not positively or negatively impact L-3's technical, cost, or overall ratings. Lockheed Martin's proposal conformed to Schedule B and to the expectations of the SOW.

### A.3. GovWorks Treated the Offerors' Proposals Unequally

L-3 claims that the Government treated the offerors unequally because the Government "downgraded" the L-3 offer for minor weaknesses and found the Lockheed Martin offer was acceptable without including the material costs for CLINs 0002 through 0005. As stated above, GovWorks did not downgrade L-3's proposal for minor weaknesses, rather the overall technical approach presented in the L-3 proposal earned a Satisfactory score. Additionally, because AFRL/HEA did not intend for offerors to propose materials on CLINs 0002 through 0005, Lockheed Martin's "failure" to include materials under those CLINs is not a deficiency.

By choosing not to attend the site visit, L-3 assumed the risk of not being as thoroughly familiar with the requirement. In addition, all questions and answers were posted on Amendment 1 including information regarding materials and CLINs 0002 through 0005. L-3 did not request further clarification regarding the pricing.

L-3 is incorrect in its assertion that Lockheed Martin submitted a technically unacceptable proposal and presented a greater risk to the Government. The AFRL/HEA technical evaluators found many strengths with the Lockheed Martin proposal. Both the Lockheed Martin and the L-

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

3 proposals had some minor weaknesses. However, the Lockheed Martin approach included some exceptional ideas and contained more strengths than the L-3 approach and consequently earned a superior score. The AFRL/HEA evaluation team found the Lockheed Martin proposal superior and provided its findings to the GovWorks Contracting Officer. L-3 is incorrect in asserting that Lockheed Martin submitted a technically unacceptable proposal. The Contracting Officer reviewed the technical evaluation and found the team evaluated the offers equally and did not evaluate one offer more harshly then the other. L-3's claim that the technical evaluation was improper, unreasonable, arbitrary and capricious is denied.

**B. GOVWORKS FAILED TO CONDUCT A REASONABLE COST REALISM ANALYSIS.**

**Contracting Officer Response: Denied in its entirety.**

L-3's protest relies on the assumption that AFRL/HEA required offerors to provide quotes for materials under CLINs 0002-0005. As clarified by questions submitted by offerors and answers provided by AFRL/HEA, AFRL/HEA did not intend for offerors to propose specific materials under CLINs 0002 – 0005. The analysis under CLIN 0002 determines all future material costs. AFRL did not expect offerors to propose material requirements under CLINs 0002 – 0005 because AFRL could not determine or evaluate materials under these CLINs until the analysis under CLIN 0002 was completed. This was covered in the Q&A responses, published in Amendment #1, and mentioned during the site visit on January 18, 2006, which L-3 did not attend. In addition the Schedule B did not include a breakout for material charges.

However, L3's failure to propose in accordance with the RFP does not validate its statement that a reasonable cost analysis was not conducted. To ensure a fair evaluation and for the purposes of price analysis, the Contract Specialist removed all Material costs for CLINs 0002 – 0005. L-3 was not downgraded for proposing materials.

An agency may conduct a fair cost or price comparison by backing out proposed costs or prices that are unique to one proposal in order to achieve an apples-to-apples comparison. *See SGT, Inc.*, 1999 WL 248531, (Comp. Gen., April 1, 1999) (Agency properly backed-out "foundry costs" in bid proposal comparison, when one offeror's proposal included foundry costs in its proposal and others did not); *University Research Company, LLC*, 2006 WL 931626 at FN1 (Comp. Gen., April 6, 2006). AFRL/HEA stated that, "LM's (Lockheed Martin's) proposal meets our requirements. By leaving out non-required and immeasurable material costs LM showed that they had a complete understanding of the SOW."

Because the quality, type and price for materials and equipment for CLINS 0002 - 0005 cannot be known at the time of proposal, the figures for materials submitted by L-3 for

these CLINS can only be an estimate with little or no meaning. They were not required by the solicitation and therefore were not evaluated.

Because the intended contract included firm fixed price and time and materials terms, a cost analysis was not required. When a solicitation calls for the award of a firm fixed price contract, the evaluating agency does not need to conduct a cost analysis, unless the RFP contains a provision requiring such. *See Son's Quality Food Company*, B-251,304, et seq., 1993 WL 316206 (Comp. Gen., Aug. 9, 1993).

When a solicitation calls for the award of a time and materials contract with fixed, burdened labor rates, the evaluating agency does not need to conduct a cost analysis, unless the RFP states otherwise. *See Resource Consultants, Inc.*, 2002 WL 1335283 at 9,(Comp. Gen., June 7, 2005), citing *General Atomics*, B-287348, B-287348.2, 2001 CPD ¶ 169 at 7, and *Enmax Corp.*, B-281965, 99-1 CPD ¶ 102 at 10.

Cost realism analyses are to be performed on cost-reimbursement contracts and on certain firm fixed price contracts under circumstances not present here. FAR § 15.404-1(d)(2). And, in "***exceptional cases***, on other competitive fixed price type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns…" FAR § 15.404-1(d)(3) (emphasis added).

**Lockheed Martin's Pricing is Unrealistic and Demonstrates a Lack of Understanding of the Requirements.**

L-3 claims that Lockheed Martin's pricing indicate its "lack of understanding of the technical requirements and its failure to bid materials." There was a significant difference between the offerors' pricing for CLINs 0002 – 0005, especially under CLIN 0002. The Contracting Officer confirmed with the AFRL/HEA evaluation team that the Lockheed Martin proposed costs for CLINs 0002 through 0005 were reasonable for performing this statement of work. Lockheed Martin's approach to CLINs 0002 – 0005, including their approach to not propose material costs, reflects the AFRL/HEA priorities. The evaluation team believed L-3's approach and pricing for this CLIN did not reflect the requirement or the AFRL/HEA priorities. L-3's proposed unsubstantiated material costs were not sufficiently described, making cost realism analysis impossible.

During the site visit on January 18, 2006, the AFRL/HEA discussed and reviewed the SOW task by task, explaining the program's overall priorities for this effort. Additionally, clarification regarding the material costs and the Schedule B were published in Amendment 1. If L-3 believed the Questions and Answers, Schedule B or Amendment 1 were conflicting, there was opportunity to submit additional questions. L-3 did not attend the site visit and did not ask further questions regarding the pricing of the solicitation.

Although Lockheed Martin did not provide an unrealistically low price, there is no requirement that an agency downgrade a technical proposal based on the fact that the awardee proposed a low

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

price. *See EC Corporation*, 1996 WL 116998 (Comp. Gen.) (Feb. 20, 1996) (Protest of agency's decision not to downgrade a proposal initially deemed to have an unrealistically low price, was denied when decision was based on holistic reading of technical proposal, which demonstrated understanding of terms).

Moreover, the RFP did not request, and the offerors did not provide, the type of cost data necessary to perform the element-by-element cost analysis that L-3 claims was required. The RFP did not require offerors to submit proposals that separated cost elements and proposed profits, L-3 cannot now reasonably claim that the agency was required to conduct a cost analysis. Such a cost analysis was not required, and there is no merit regarding L-3 arguments requiring a cost analysis. As stated above, CLINS 0001 through 0005 of the RFP either were firm-fixed-price or time-and-materials. Under such terms a "price analysis," not a "cost analysis," is used to determine that proposed pricing is fair and reasonable, "without evaluating its separate cost elements and proposed profit." (FAR § 15-404-1(b)(1)-(2)).

The Contracting Officer analyzed the offerors' pricing in accordance with usual business practices. In addition to comparing the offerors' pricing to each other, the Contracting Officer compared the pricing to AFRL/HEA estimates. Also, the Contracting Officer compared each offerors' proposed individual labor rates to the applicable GSA PES Schedule rates, and determined the proposed rates were fair and reasonable. AFRL/HEA did not expect offerors to speculate on material costs for CLINs 0002 – 0005; therefore, these costs were removed from the L-3 pricing for evaluation purposes. The Contracting Officer acknowledged that L-3 labor included some costs associated with the material. However, based on the RFP instructions, "contract award shall be made to the responsible Offeror whose offer, in conforming to the RFP, provides an overall best value to the Government, technical evaluation factors and cost considered. The Government's objective is to obtain the highest technical quality considered necessary to achieve the project objectives, with a realistic and reasonable cost." Lockheed Martin technical approach was clearly superior and AFRL/HEA reviewed the labor categories and hours proposed for each CLIN and found that Lockheed Martin's proposed hours were reasonable to perform the scope of the effort as defined in the SOW. The Contracting Officer did not request L-3 revise its pricing because revised pricing would not increase L-3's likelihood for award.

The "price analysis" techniques utilized by the Government were appropriate. "The depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion, and [GAO] will not disturb such an analysis unless it lacks a reasonable basis." *See Redcon, Inc.*, 2005 WL 1690204 (Comp. Gen., Oct. 11, 2000), citing *Ameriko-OMSERV*, B-252879.5, 94-2 CPD ¶ 219 at 4 (Dec. 5, 1994).

The FAR allows for a number of price analysis techniques, including: comparing bid prices with one another; comparing prices with prior prices on similar work; comparing proposed prices with independent Government estimates; and, analyzing the pricing information provided by the offeror. (FAR § 15.404-1(b)(2)(i)-(vii)).

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

In summary, the technical evaluation team found the Lockheed Martin price was fair and reasonable for performing the requirements of the SOW and reflected adequate understanding of the program requirements. The Contracting Officer was not required to conduct a cost analysis. However, the Contracting Officer conducted a reasonable and adequate price analysis and determined that award to Lockheed Martin was in the best interests of the Government.

**C. GOVWORKS FAILED TO CONDUCT A RATIONAL COST TECHNICAL TRADEOFF.**

**Contracting Officer response: Denied in its entirety.**

L-3 assumes that the technical evaluation was unreasonable and the cost realism analysis was flawed; therefore, any award decision based on the technical evaluation and the cost realism analysis renders the award decision unreasonable.

The Government's objective is to obtain the highest technical quality considered necessary to achieve the project objectives, with a realistic and reasonable cost. This was accomplished in two steps: 1) A cross-section of AFRL/HEA technical experts evaluated the offers and reported their findings; and, 2) The Contracting Officer reviewed the technical report and evaluated the price proposals.

The AFRL/HEA technical evaluators found many strengths with the Lockheed Martin proposal. Both the Lockheed Martin and the L-3 proposals had some minor weaknesses. However, the Lockheed Martin approach included some exceptional ideas and contained more strengths than the L-3 approach. The AFRL/HEA evaluation team found the Lockheed Martin proposal superior and provided their findings to the Contracting Officer. The Contracting Officer reviewed the report and proposals and determined the evaluation was conducted fairly.

L-3 claims that the Government failed to perform a proper cost/technical tradeoff. However, when the Government awards a contract to the technically superior, lower cost offeror, the Government need not perform a cost/technical tradeoff. (*See Weber Cafeteria Services, Inc.*, B-290085.2, 2002 CPD P 99 (Comp. Gen.) (June 17, 2002). A cost/technical tradeoff, as advocated by L-3, is necessary only where one offer is rated higher technically than another, but the other offer is lower in price.

In summary, L-3 Communications' grounds for protest are denied. The first claim that the GovWorks' technical evaluation of the offerors proposals was improper, unreasonable, arbitrary and capricious is not evident. This is not a situation where the technical approach would have been rated Excellent, but the weaknesses "downgraded" it to Satisfactory. Rather, the technical approach overall was Satisfactory. Both the Lockheed Martin and the L-3 proposals had some minor weaknesses. However, the Lockheed Martin approach included some exceptional ideas and contained more strengths than the L-3 approach and earned a superior score. The

GovWorks
FEDERAL ACQUISITION CENTER
Government Working With Government

AFRL/HEA evaluation team found the Lockheed Martin proposal superior and provided its findings to the GovWorks Contracting Officer. The Contracting Officer reviewed the evaluation and found the evaluation team reviewed offers fairly and in accordance with the criteria.

Furthermore, AFRL/HEA did not anticipate offerors to include material costs for CLINs 0002 through 0005. This was specified in the published Questions & Answers and it was clarified during the site visit. L-3 had equal opportunity to submit questions and to attend the site visit. In any case, the materials L-3 proposed in CLINs 0002 through 0005 did not result in "downgrading" the L-3 proposal.

Lastly, the second claim that GovWorks failed to conduct a reasonable cost realism analysis is also denied. The Contracting Officer analyzed the offerors' rates against each other and against GSA schedule rates for similar labor categories and found the Lockheed Martin rates to be fair and reasonable. The technical evaluation team reviewed the offerors' pricing and the Lockheed Martin pricing was found to be reasonable to perform the requirement. Additionally, the third claim that GovWorks failed to conduct a rational cost technical tradeoff is unsupported. A cost/technical tradeoff was not required for determining award to Lockheed Martin was in the best interests of the Government. The Lockheed Martin proposal was judged by the technical evaluation team to provide the best technical solution to the Government requirement, and the price submitted by Lockheed Martin was determined fair and reasonable. Therefore, the Contracting Officer determined the award to Lockheed Martin is in the best interest of the Government. The protest is denied in its entirety.

Respectfully,

KATHLEEN ENGEL
Contracting Officer

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| L-3 COMMUNICATIONS CORP.<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR<br><br>Defendant. | ) | No. ____________<br>Judge: ____________ |

**AFFIDAVIT OF DAVID F. WILLIAMS**

I, David F. Williams, hereby declare as follows:

1. I am the Vice President, Training Systems, for L-3 Communications Corporation, Link Simulation & Training Division ("L-3"), a party to the above-captioned matter. My work address is 2200 Arlington Downs Road, Arlington, Texas 76011 and phone number is (817) 619-4600.

2. The matters herein are true and correct, to the best of my knowledge, and I am available to provide live testimony on these matters, if necessary.

3. I have been in the Defense Industry for approximately 25 years. I have been employed by L-3 since January 2001 as the Vice President for the Link Simulation & Training training services business. I received a Bachelor of Science degree from Jones Business College in 1979 and received a Masters of Business degree from Southern Methodist University in 1995,

4. I am intimately aware of the issues involved with respect to the award of a contract for Joint Terminal Attack Controller Training and Rehearsal System ("JTAC TRS") Engineering and Design Support, pursuant to Request for Proposals ("RFP") Number 60246, to

Lockheed Martin Services Inc. ("Lockheed Martin"). I am also aware of the harm that will result to L-3 if we are not awarded a contract under the solicitation, or if we must demobilize and later are awarded a contract, causing the company to ramp-up for performance after demobilization.

5. L-3 will be forced to layoff and/or terminate a part of its workforce that were involved in the initial Dome development and manufacturing if it is not performing the JTAC TRS contract. It is likely that we will begin layoffs of approximately 3 people within 6 weeks if an injunction is not granted. This represents a loss of 23% of the L-3 workforce identified to produce the JTAC TRS. The loss of these individuals will have a substantial impact on other L-3 activities at our Mesa, AZ location. We will incur various costs and disruption associated with these layoffs/terminations. Of course, we would incur additional costs and expend significant effort to re-hire people if the injunction was not granted but later a contract was awarded to L-.3

6. The workers that L-3 would lose were specially trained to work on the JTAC TRS and have unique experience that would be difficult and expensive to replace.

7. L-3's exclusive subcontract with Firearms Training Systems, Inc. ("FATS"), which gave L-3 a competitive advantage over its competitors as FATS proprietary code was required to perform CLIN 0004, would be terminated if Lockheed Martin was permitted to commence performance of the JTAC TRS contract.

8. The issues discussed above will result in L-3 expending a significant effort and incurring significant cost.

9. The demobilization will also be disruptive to both L-3 and the government.

10. If we were forced to demobilize but later awarded the contract, the GovWorks' customer, the Department of the Air Force would be significantly disrupted due to (1) the

removal of L-3's employees, and (2) Lockheed Martin's start of its implementation plan and subsequent removal of its employees. This would also increase any termination for convenience costs incurred by the government if Lockheed Martin's contract was terminated after performance began.

## VERIFICATION UNDER 28 U.S.C. § 1746

I, David F. Williams, affirm under penalty of perjury this 30th day of May, 2006, that the foregoing is true and correct.

David F. Williams